UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STEVEN R.,

        Plaintiff,

    v.

ANDREW SAUL,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

No. 19 CV 388

Magistrate Judge McShain

MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Steven R., moves for reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits [16, 17][2]. The Commissioner has filed a response brief, asking this Court to affirm the Commissioner's decision [24]. Plaintiff has filed his reply [25]. For the following reasons set forth below, plaintiff's motion for summary judgment is granted and the Commissioner's motion to affirm is denied.

## I. Procedural History

Plaintiff applied for supplemental security insurance benefits ("SSI") on December 31, 2014, alleging an onset date ("AOD") of January 1, 2013 (R. 15, 59, 72,

---

[1] On February 25, 2019, by consent of the parties and pursuant to 28 U.S.C § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgement [11, 13].

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to the Certified Copy of Administrative Record ("Record"), which use the Record's original page number and are delineated as (R.).

160). Plaintiff's claim and subsequent appeal for reconsideration were both denied (R. 15). Shortly thereafter, plaintiff filed a written request for a hearing in front of an Administrative Law Judge ("ALJ") (R. 15). Plaintiff and a Vocational Expert ("VE") testified at the hearing which was held on July 10, 2017 (R. 15, 30). On October 4, 2017, the ALJ issued a decision denying plaintiff's application for supplemental security income (R. 23). The Appeals Council declined to review the ALJ's decision, making it the final word from the Commissioner (R. 1-3). 20 C.F.R. § 416.1481.

## II. Medical Background

On October 22, 2008, plaintiff was seen by therapist Dr. Deena Nardi (R. 475-76). Dr. Nardi indicated that plaintiff had Asperger-like behaviors, signs of anxiety disorder, and chronic depression (R. 475). She also noted that he would benefit from the programming at Cornerstone Services and had a 61 GAF score (R. 475-76).

On August 19, 2014, plaintiff was examined by Thomas Lee, M.D., to evaluate what plaintiff described as migraine headaches (R. 293). Plaintiff described the severity of the headaches as a range from barely noticeable to "debilitating" and admitted never seeing a neurologist or other physician for the headaches (*Id.*). Dr. Lee noted the cause of plaintiff's headaches was unclear and sent him for further testing including an MRI (R. 296). The August 26, 2014 MRI showed no enhancing mass or acute infarct; an increased CSF signal within the optic nerve sheath bilaterally; and a mucosal retention cyst in the right sinus (R. 302, 309).

Plaintiff visited his eye doctor, Samra Hashmi, M.D., on September 4, 2014 on referral form his primary care physician for a fundus exam (R. 431). Upon

examination, plaintiff's fundus was normal (R. 432). Dr. Hashmi recommended plaintiff schedule a follow up appointment in two months and see a neurologist for an evaluation and management with a spinal tap (R. 433). At plaintiff's November 3, 2014 appointment with Dr. Hashmi, he complained of flashes or floaters and headaches (R. 403). Dr. Hashmi referenced a pseudotumor cerebri and noted plaintiff had yet to see a neurologist to confirm the diagnosis and treatment (R. 405).

Plaintiff had an appointment with Thomas Hurley, M.D., a neurosurgeon, on December 2, 2014, on consultation from Dr. Lee for headaches after plaintiff was told he had an abnormal MRI and a pseudo tumor (R. 322-23). Dr. Hurley reported that plaintiff's history and presentation was "very atypical" for pseudotumor cerebri and there was no history of even transient change of vision (R. 325). Dr. Hurley recommended obtaining the ophthalmologist records and a referral to medical neurology for a more definitive work-up for chronic headaches (*Id.*).

Plaintiff was referred to neurologist Kathleen McCahill, M.D. for an evaluation of his headaches. At his office visit with Dr. McCahill on December 19, 2014, plaintiff described the severity of his pain from the headaches at a five out of ten (R. 337). Dr. McCahill prescribed Depakote and referred plaintiff to psychiatry for a possible autism spectrum disorder (R. 339). On January 27, 2015, plaintiff reported to Dr. McCahill that the Depakote "did nothing at all" and that he was advised not to see a psychiatrist by a case worker at the "disability place" (R. 342). Plaintiff described his headaches as not more severe but may be more frequent (*Id.*). Dr. McCahill prescribed Topamax for plaintiff (R. 344).

In the function report that plaintiff completed on March 12, 2015, he indicated that he suffers from chronic migraines that prevent him from "going out much" and can be "debilitating" (R. 206, 213). Plaintiff reported that he spends his days reading and watching television except for the days he goes out with his friends to the ministry or to their meetings twice a week (R. 207). Plaintiff prepares "occasional" meals for himself daily (R. 208). He is also capable of dusting, vacuuming and taking out the garbage when asked by his grandmother (*Id.*). Plaintiff also stated that he goes grocery shopping every other week (R. 209). Plaintiff enjoys reading, computer games and watching television but needs to stop those activities if he feels headaches coming on (R. 210). He spends time with others at religious activities three times a week (*Id.*). He does not need to be reminded to go places and he does not need to be accompanied (*Id.*). Plaintiff can pay attention for 20 minutes, finish what he starts, follow written instructions "very well" and follow spoken instructions not as good as written instructions (R. 211). He reported that he gets "along fine" with authority figures but is uncomfortable with changes (R. 212).

Plaintiff's grandmother also filled out a function report dated March 13, 2015 in which she indicated that plaintiff lives with her, has chronic headaches and Asperger's (R. 218, 225). She described that during the day, plaintiff makes breakfast and lunch, reads, is on the computer, and attends church (R. 219). His grandmother also indicated that on a daily basis, plaintiff can prepare sandwiches, frozen dinners, soup, pizza, and cereal (R. 220). She also reported that plaintiff is able to clean, sweep, and take out the garbage when she asks him to (*Id.*). Plaintiff attends meetings for

church and goes to the store, and he is capable of going out alone (R. 221). She also checked that plaintiff can drive but does not have a car (*Id.*). Plaintiff grocery shops every other week (*Id.*). He is capable of counting change and handling a savings account but not paying bills or using a checkbook (*Id.*). His grandmother stated that plaintiff "loves to read," plays computer games, and watches television (R. 222). He also goes to meetings with friends two to three times a week at the church community center (*Id.*). Plaintiff's grandmother reported that he was "very good" at following written instructions but had "some trouble" following spoken instructions (R. 223). He gets along "good" with authority figures (R. 224).

On April 15, 2015, plaintiff was seen at PCP Primary Care by William Imlach, D.O. as a new patient (R. 353). The report noted that plaintiff has a history or Asperger's syndrome which affects his social interactions – his ability to hold a job for longer than a few months, because he has difficulty adjusting to new situations and does not have initiative (R. 353). It was also noted that plaintiff does not have cognitive deficits and is able to clean himself, eat, and grocery shop (*Id.*). The report also discussed plaintiff's history of headaches that are worse in the morning and ease up during the day after he uses aspirin (*Id.*). Plaintiff was referred for a psychology evaluation and testing and placed on topiramate (R. 355).

On May 27, 2015, plaintiff presented to Dr. Imlach for a follow-up appointment (R. 385). Plaintiff reported that the topiramate did not help and he has daily headaches (*Id.*). Dr. Imlach reported that plaintiff's October 2014 MRI was negative and that he was under the care of a neurologist and had an appointment with a

5

psychologist in July (*Id.*). Plaintiff also reported he continued to have difficulty with social interaction and concentration (*Id.*). Dr. Imlach discontinued topiramate and began amitryptiline (R. 386). Dr. Imlach reported that the diagnosis of "spectrum disorder appear[ed] accurate" and that plaintiff had a "small" likelihood of getting and holding a job (R. 387).

Plaintiff underwent a mental status examination by John R. Brauer, Psy.D. on June 17, 2015 (R. 361). Dr. Brauer recounted that plaintiff described a long history of anxiety around other people due to being bullied and picked on as a child and that plaintiff was diagnosed with Asperger's at Cornerstone services in 2010 or 2011 (*Id.*). Dr. Brauer noted that plaintiff expressed an interest in social interaction but that he isolated due to anxiety about people disliking him and picking on him (*Id.*). Dr. Brauer discussed that plaintiff attended mainstream classes, typically earning grades of Cs and Ds, and that plaintiff attributed his doing best with teachers he liked, and worst with teachers he disliked (R. 362). Dr. Brauer recounted plaintiff's work experience and that he was fired for "working too slowly" (*Id.*). Dr. Brauer discussed that plaintiff lives with his grandmother and uncle, spends his time reading in his room, does minimal chores when asked, and is moderately socially active at his twice weekly church meetings (*Id.*).

Dr. Brauer also completed a mental status exam and described that plaintiff denied a history of suicide but wondered what was the point of his minimalist life (R. 363). Plaintiff's concentration and attention was within normal limits; his general fund of knowledge was grossly intact; his capacity for abstraction was reasonably well

developed; and his judgment was grossly appropriate for simple situations (*Id.*). Dr. Brauer diagnosed plaintiff with social anxiety disorder and persistent depressive disorder (R. 364).

On June 29, 2015, state medical consultant, Kirk Boyenga, M.D., reviewed plaintiff's record (R. 59-69). Dr. Boyenga determined that plaintiff had mild limitations in activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (R. 64). Dr. Boyenga explained that plaintiff experienced affective and anxiety disorders but there was no documentation of inpatient, hospital or outpatient psychiatric treatment (R. 67). Dr. Boyenga referenced a single visit concluding presence of Asperger's syndrome but with the need for further assessment and also some physical problems (*Id.*). He found plaintiff was capable of performing simple and detailed tasks (*Id.*).

James Hinchen, M.D., the state's medical consultant, reviewed plaintiff's record on June 30, 2015 (R. 59-69). Dr. Hinchen noted that plaintiff has a history of chronic migraines since he was a child and uses Topiramate and aspirin to decrease the pain (R. 63). Dr. Hinchen noted there was "minimal medical intervention" with regards to plaintiff's chronic migraine headaches (*Id.*).

On July 8, 2015, plaintiff saw Dr. Imlach where it was reported that plaintiff was prescribed amitriptyline but that his headaches persisted (R. 382). Plaintiff woke up with headaches but had no problem falling asleep (*Id.*). Plaintiff's headaches occurred mostly in the morning and he took aspirin which decreased the intensity

7

(*Id.*). Dr. Imlach stopped plaintiff on amitriptyline, started him on metoprolol succinate, and referred him to a neurologist and ophthalmologist (R. 384).

Plaintiff saw his neurologist, Dr. McCahill, on September 4, 2015 for a follow up appointment where he described daily, excruciating, and disabling headaches that the prescribed medication did not help (R. 367). Dr. McCahill reviewed plaintiff's MRI which showed CSF density in the optic sheath bilaterally but also noted that plaintiff was seen by an ophthalmologist who assured him there was nothing wrong with his eyes (R. 369). Dr. McCahill asked plaintiff to take Depakote and metoprolol together (*Id.*).

On September 8, 2015, plaintiff completed another function report wherein he described "excruciating migraines" that limit his ability to leave the house (R. 238-45). During the day he does recreational things like watching television and reading (R. 239). Plaintiff reported that he prepares his own meals – sandwiches, frozen dinners, ramen – on a daily basis (R. 240). He will clean and do other household chores one to two times per week with verbal reminders (*Id.*). Plaintiff stated he is capable of going outside alone but does not drive because he does not have a car (R. 41). He reported that he goes grocery shopping once a week and is capable of paying bills, counting change, handling a savings account and using a checkbook (*Id.*). Plaintiff described his hobbies as reading, watching television, and playing video games but that his migraines can interfere with these activities (R. 242). Plaintiff also goes to religious meetings three times a week but described that his migraines interfere with him attending the meetings "sometimes" (R. 242-43). Plaintiff follows

8

written instructions "very well" and spoken instructions "well" (R. 243). He also gets along "fine" with authority figures (R. 244).

Also, on September 8, 2015, plaintiff's grandmother filled out a second function report wherein she stated that plaintiff's headaches keep him in his room most of the day (R. 247-54). She reported that he watches television, reads, and grocery shops when he is able (R. 247, 250-51). Plaintiff prepares simple meals on his own on a daily basis (R. 249). He also cleans and does the dishes when his grandmother asks as long as his headache is "not bad" (*Id.*). His grandmother indicated that he goes out three times a week if his "headaches don't interfere with church" and that friends drive him because plaintiff does not have a car (R. 250-51). Plaintiff is able to count change and handle a savings account but is not able to pay bills or use a checkbook and his grandmother explained that he does not have bills or a checkbook (R. 250). Plaintiff is "good" at following both written and spoken instructions (R. 252). She also indicated that plaintiff has no problems getting along with family and friends (R. 252) and gets along "very good" with authority figures (R. 253). Plaintiff handles changes in routine "pretty well" but stress is "sometimes a problem" according to his grandmother (R. 253).

Dr. Imlach saw plaintiff for a follow-up appointment regarding management of his headaches on September 9, 2015 (R. 379). Dr. Imlach noted that Plaintiff reported worsening headaches over the previous two years but no acute change recently (*Id.*). Dr. Imlach continued plaintiff on divalproex and weened him off of metoprolol (R. 381).

Plaintiff saw Dr. McCahill on December 4, 2015 for a routine follow up visit and described continuing to have daily headaches, some severe (R. 422). Dr. McCahill noted that plaintiff was positive for headaches but was negative for all other systems reviewed (R. 423). Dr. McCahill recommended that plaintiff be seen at a headache clinic, he was given the name of one, and discharged from her care with instructions to return if symptoms worsen of fail to improve (R. 422, 424).

At the reconsideration level, Ellen Rozenfeld, Psy.D., reviewed plaintiff's record on December 19, 2015 (R. 72-82). Dr. Rozenfeld determined that plaintiff had the medically determinable impairments of migraine (non severe), anxiety disorder (severe), and affective disorder (severe) (R. 77). She opined that plaintiff's restrictions of activities of daily living were mild; difficulties in maintaining social functioning were moderate; difficulties in maintaining concentration, persistence or pace were mild; and he had no episodes of decompensation (*Id.*). Dr. Rozenfeld found that there was "no clinical evidence to support material change" to the initial determination and that while plaintiff's mental impairment is severe, it does not meet or equal the listings as they impose no more than moderate limitations (R. 78).

On January 6, 2016, plaintiff had an appointment with Dr. Imlach (R. 437-39). Plaintiff reported that his headaches persisted, he stopped all his medication because none of them worked, and he was advised by his neurologist to seek a second opinion from a headache specific neurologist (R. 437). Dr. Imlach reported plaintiff's "Active Problems" as Asperger syndrome, headaches, and migraines (*Id.*). Dr. Imlach's plan

for plaintiff included a neurological referral/consult second opinion at a headache clinic and to continue Excedrin (R. 439).

On June 7, 2017, Dr. Imlach prepared an RFC questionnaire on plaintiff (R. 471-73). Dr. Imlach stated that he began treating plaintiff on April 15, 2015 and that plaintiff was diagnosed with Asperger's syndrome and migraine headaches (R. 471). Dr. Imlach described plaintiff's prognosis as "poor" and the sign and symptoms of his impairments as pain, impaired concentration, anxiety, and cognitive impairment (*Id.*). Plaintiff's pain was described as intractable migraine headaches resulting in dull, pain in head (*Id.*). The factors that precipitated plaintiff's pain consisted of changing weather, movement/overuse, stress, heat, fatigue, cold, humidity, and allergy (*Id.*). Dr. Imlach noted that plaintiff underwent MRI testing showing an increase in CSF fluid (R. 472). Dr. Imlach also checked that plaintiff's description of his pain was credible; emotional factors contribute to the severity of his symptoms and functional limitations; concentration and attention are constantly impacted by plaintiff's pain; and plaintiff is severely limited in his ability to deal with work stress (*Id.*). Plaintiff experienced dizziness and drowsiness while on medication (*Id.*). Dr. Imlach opined that plaintiff did not have the ability to work in a competitive environment on a full-time basis because plaintiff Asperger's syndrome leads to "profound communicative impairments" and neurocognitive dysfunction (*Id.*). Dr. Imlach checked that plaintiff would need to lie down during the work shift and that he would be absent more than three times a month (*Id.*).

### III. Hearing

At the July 10, 2017 hearing before the ALJ, plaintiff, represented by counsel, testified that his date of birth is October 3, 1985 and that he lives with his grandmother and uncle in a townhouse (R. 35). Plaintiff stated he graduated from high school and has a driver's license (R. 36). Plaintiff testified that he served in the military for four months and was medically discharged (R. 36).

Plaintiff testified that he worked at Walmart in 2007 or 2008 for about a year stocking shelves but was terminated for slowness (R. 37, 49). Plaintiff stated that he cannot work because he experiences "severe headaches" and he is "very shy" (R. 38, 40).

Plaintiff explained that he saw a neurologist, Dr. Kathleen McCahill, but stopped a few years ago because she could no longer help him with his headaches (R. 38). Plaintiff continues to see his primary care physician, Dr. Imlach, who used to prescribe medication for the headaches but no longer does because "they [don't] work" (R. 38-39, 51). The only medication plaintiff testified that he takes is over-the-counter (R. 39). Plaintiff wakes up with headaches that vary in severity but can be "debilitating" about four times a week (R. 39-40). Plaintiff stated that the pain is located on the right side of his head around his ear (R. 40). On days like that, plaintiff testified that he stays in his room all day and takes Excedrin (*Id.*). Plaintiff stated that his last visit to the emergency room for his headaches was in February 2016; he underwent a CT scan and was prescribed medication that did not help (R. 51-52).

Plaintiff testified that he "rarely" drives because he does not have a car and that his grandmother drove him to the hearing (R. 43). He is able to make a "very simple" breakfast and lunch for himself and sometimes helps his grandmother cook (*Id.*). Plaintiff stated that he helps clean up after meals, can wash dishes, and helps clean the house under his grandmother's direction by sweeping, vacuuming, dusting, and straightening up but he does not do his own laundry (R. 43, 45, 50). Plaintiff goes grocery shopping with his grandmother (R. 46).

Plaintiff also testified that he knows how to use a computer but does not keep in touch with people through email or Facebook (R. 45). His hobbies include reading historical fiction, playing videogames and watching Jeopardy (R. 46-47). Plaintiff has friends that he sees at meetings at a religious hall twice a week for about 90 minutes to two hours (R. 46, 48). He testified that his migraines can be so bad on certain days that he misses these meetings two to four times a month (R. 48, 50).

During the hearing, the VE testified that plaintiff's past work as a store laborer was classified as medium and unskilled (R. 53). The ALJ provided the VE with a number of hypothetical limitations in order to determine plaintiff's employment prospects (R. 53-55). The ALJ asked first whether work was available for a 29-year-old individual, with a high school education and work experience as a store laborer; no exertional limits but avoid concentrated exposure to noise, avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dust, and gases and poorly ventilated areas; work limited to simple, routine, repetitive tasks; work performed in a work environment free of fast-paced production requirements, involving only simple

work-related decisions, and with few, if any, work place changes; and brief and superficial interaction with the public, and only brief, superficial interaction with coworkers (R. 53-54). Under such a hypothetical, the VE testified that plaintiff's past work would be eliminated (R. 54). But the VE testified that there are medium, unskilled jobs in the national economy that could be performed such as machine feeder, hand packager, and lamination assembler (*Id.*). If, for one third of the day, the individual required extra supervision and would have to be redirected to stay on task, then they would not be able to perform those jobs (R. 55-56).

The ALJ's second hypothetical individual was a 29-year-old individual with a high school education and experience as a store laborer; no exertional limitations; avoid concentrated exposure to a noisy environment; avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dust, and gases, as well as poorly ventilated areas; work limited to simple, routine, repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, and with few, if any, workplace changes; only brief, superficial interaction with the public, coworkers, and supervisors; and would miss work three days a month (R. 54-55). The VE testified that this hypothetical individual would not be capable of sustaining or maintaining any competitive work (R. 55).

## IV. The ALJ's Opinion

On October 4, 2017, the ALJ, following the five-step sequential evaluation process, determined that plaintiff was not disabled (R. 23). At Step One, the ALJ

found that plaintiff had not engaged in substantial gainful activity since December 31, 2014 (R. 17).

At Step Two, the ALJ found that plaintiff had two severe impairments: anxiety disorder and depression (R. 17). At this step, the ALJ also considered plaintiff's headaches including their effect on his functioning and determined plaintiff did not have any severe physical impairments (R. 17-18). In doing so, the ALJ reviewed plaintiff's occasional emergency room visits for headache symptoms but noted he has not been hospitalized for this problem (R. 17). The ALJ discussed that plaintiff's imaging studies showed no evidence of tumor or demyelinating disease and his neurologic exam was normal (*Id*.). Plaintiff's MRI dated August 26, 2014 demonstrated no intracranial lesion, prominent arachnoid space along convexity and no hydrocephalus (R. 17-18). The ALJ also discussed that plaintiff's ophthalmologist found nothing wrong with his eyes (R. 18). The ALJ reviewed plaintiff's testimony about his headaches and medication as well (*Id*.).

The ALJ reviewed the state medical consultant, James Hinchen, M.D.'s, opinion that plaintiff had a history of chronic migraines since he was a child and used Topiramate and Aspirin to decrease the pain; there was minimal medical intervention, and thus Dr. Hinchen determined plaintiff had no severe physical impairment (R. 18). The ALJ found this opinion consistent with the evidence and adopted the findings (*Id*.). Although the ALJ noted that he did place restriction on his RFC based on his headaches and in doing so, adopted state medical consultant,

15

Dr. Greco's opinion of December 21, 2015 that plaintiff avoid concentrated exposure to noise and pulmonary irritants (*Id.*).

At Step Three, the ALJ determined that plaintiff's impairment or combination of impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926) (R. 18). The ALJ discussed plaintiff's consultative examination with John Brauer, Psy.D. on June 17, 2015, wherein plaintiff described a long history of anxiety around other people due to being bullied and picked on throughout his childhood (*Id.*). Plaintiff was diagnosed with Asperger's at an intake interview at Cornerstone Services based on his social anxiety (*Id.*). The ALJ noted that Dr. Bauer diagnosed plaintiff with social anxiety disorder and persistent depressive disorder (*Id.*).

The ALJ next discussed that plaintiff's mental impairments, singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06 (R. 18). In doing so, the ALJ analyzed the paragraph B criteria and determined they were not satisfied because plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation (R. 18 – 20).

*First*, the ALJ determined that plaintiff had moderate limitations in understanding, remembering or applying information (R. 18). The ALJ discussed that plaintiff obtained C's and D's in school for most courses which he attributed to doing best with teachers he liked and worst with teachers he disliked (R. 19). At a September 9, 2015 visit for his headaches, the ALJ reviewed that plaintiff's short term memory was intact (*Id.*). Thus, the ALJ concluded that the record did not

establish marked limitation because there was no indication of cognitive deficits or impairment memory loss (*Id.*).

*Second*, the ALJ found that plaintiff had moderate limitations in interacting with others (R. 19). The ALJ discussed plaintiff's psychological consultative examination wherein plaintiff reported interest in social interaction but stated his isolation was due to anxiety about people not liking him and picking on him rather than from a lack of desire or interest in social interaction (*Id.*). The ALJ noted that according to plaintiff's grandmother, he stays in his room listening to headphones and that he gets along "very good" with authority figures (*Id.*). The ALJ also discussed that plaintiff is able to maintain social interaction and provided examples such as attending church meetings twice a week, having friends, having a girlfriend, going to the church community center, and to the grocery store (*Id.*). Based on these moderate limitations, the ALJ limited plaintiff to only brief and superficial interaction with the public, co-workers and supervisors (*Id.*).

*Third*, the ALJ concluded that plaintiff had moderate limitations in concentration, persistence and pace (R. 19). The ALJ relied on Dr. Brauer's opinion that plaintiff's concentration and attention appeared to be within normal limits as evidenced by his performance on digit span, serial sevens, and simple arithmetic problems (*Id.*). The ALJ also discussed that the activities that plaintiff performs such as reading and playing games on his computer show his ability to concentrate and pay attention (*Id.*). Additionally, plaintiff's grandmother reported that he handles changes in routine "pretty well" and stress is "sometimes a problem" (*Id.*). The ALJ

took this into account and found that plaintiff could work in a place with few, if any, workplace changes (*Id.*). The ALJ also discussed plaintiff's firing from his jobs because he was "too slow" and a September 9, 2015 visit for his headaches where it was noted that plaintiff had a normal attention span (*Id.*). The ALJ determined that plaintiff retained sustained concentration necessary for simple, routine and repetitive tasks performed in a work environment free of fast paced production requirements; involving only simple, work-related decisions; and with few, if any, work place changes (*Id.*).

*Fourth*, the ALJ determined that plaintiff had no limitations in his ability to adapt or manage himself (R. 19). But, the ALJ limited him to work with few, if any, work place changes (*Id.*).

Next, the ALJ reviewed state medical consultant Kirk Boyenga, PhD.'s June 29, 2015 determination that plaintiff had mild limitation in activities of daily living, moderate limitation in social functioning, mild limitation in concentration, persistence or pace with no episodes of decompensation (R. 19). The ALJ also discussed that Dr. Ellen Rozenfeld, PsyD, came to the same conclusion after her December 19, 2015 review of plaintiff's record (*Id.*). The ALJ explained that Dr. Rozenfeld determined plaintiff's ability to carry out very short and simple instructions was not significantly limited; his ability to maintain attention and concentration for extended periods was moderately limited; his ability to perform activities within a schedule, maintain regular attendance, and be punctual was not significantly limited; and his ability to work in coordination with or in proximity to

18

others and with the general public is moderately limited (R. 19-20). The ALJ gave great weight to Drs. Boyenga and Rozenfeld's opinions because they are mental health specialists whose opinions were supported by the objective evidence of record and the evidence received later into the record would not alter the consultants' findings concerning plaintiff's mental functioning (R. 20).

Next, the ALJ reviewed the October 22, 2008 letter from Deena Nardi, PhD, that plaintiff could perform all functions with training supportive counseling and new coping skills (R. 20). Dr. Nardi assessed plaintiff with Aperger's syndrome and a global assessment of functioning ("GAF") of 61 (GAF of 61-70 is mild symptoms; GAF of 51-60 is moderate symptoms) (*Id.*). The ALJ gave this opinion some weight because it was at "the cusp on mild-moderate" but after listening to plaintiff's testimony, the ALJ determined plaintiff had mostly moderate limitations (*Id.*).

The ALJ determined plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, so the paragraph B criteria were not satisfied (R. 20). The ALJ also found that the paragraph C criteria were not satisfied (*Id.*).

Before continuing to Step Four, the ALJ reviewed the record and determined that plaintiff had the RFC to perform a full range of work at all exertional levels but with the nonexertional limitations of avoiding concentrated exposure to noise, pulmonary irritants (fumes, odors, dusts and gases) and poorly ventilated areas; limited to work that involves simple, routine and repetitive tasks; performed in a work environment free of fast paced production requirements; involving only simple,

19

work-related decisions; and with few, if any, work place changes; and only brief and superficial interaction with the public, co-workers and supervisors ((R. 20). The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record (R. 21).

The ALJ reviewed plaintiff's grandmother's functional report dated March 13, 2015 wherein she indicated he had Asperger's syndrome and chronic headaches but did not check any boxes related to functional limitations (R. 21). Plaintiff's grandmother did report that he could use a computer, go to church, read, go grocery shopping, and perform household chores (*Id.*). Her September 2015 information was similar to her prior report (*Id.*). The ALJ considered plaintiff's grandmother's reports in the context of plaintiff's mental limitations and found that it was consistent with his finding that plaintiff had no physical limitations (*Id.*).

Next, the ALJ reviewed Dr. Imlach's medical source statement dated June 7, 2017, noting that plaintiff would miss more than three days of work a month (R. 21). The ALJ gave little to no weight to Dr. Imlach's opinion because the limitations were not supported by the objective evidence, including the doctor's own treatment notes (*Id.)*. The ALJ explained that Dr. Imlach stated plaintiff had impaired concentration, anxiety and cognitive impairment, and that plaintiff's concentration and attention are constantly impacted by his pain and fatigue (*Id.*). However, the ALJ also explained that Dr. Imlach's treatment notes indicate plaintiff was interactive with

appropriate mood/affect, normal attention span and intact memory (*Id.*). Next, the ALJ reviewed Dr. Imlach's opinion that plaintiff's Asberger's syndrome leads to "profound communicative impairments" but the ALJ noted that plaintiff was able to socialize (he has friends and attends church meetings) which showed his ability to communicate (*Id.*).

The ALJ determined that plaintiff's subjective complaints and alleged limitations were not fully persuasive based on the evidence he discussed, plaintiff's activities, and the medical opinions and therefore, plaintiff retained the capacity to work within the limitations set forth in the RFC (R. 22).

The ALJ found at Step Four that plaintiff was not capable of performing past relevant work (R. 22). In doing so, the ALJ adopted the findings of the VE (*Id.*).

At Step Five, based on plaintiff's age, education, work experience and RFC, and based on the VE's testimony, the ALJ determined that there were jobs in the national economy that plaintiff could perform and thus he was not disabled (R. 22).

## V. Analysis

I review the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is a standard that "requires more than a mere scintilla of proof and instead such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walker v. Berryhill,* 900 F.3d 479, 482 (7th Cir. 2018) (internal quotation marks and citation omitted). The ALJ must "build a logical bridge from the evidence to his conclusion,

but he need not provide a complete written evaluation of every piece of testimony and evidence." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (citation omitted).

Plaintiff made two arguments in favor of remand: (1) the ALJ failed to accommodate plaintiff's chronic migraine headaches in the RFC assessment; and (2) the ALJ's Step 3 assessment of the "paragraph B" criteria is unsupported and unsupportable, and premised upon an untenable assessment of opinion evidence [17 at 6-14]. The case is remanded on the first basis, and, therefore, the second argument is not addressed.

Plaintiff claims that the ALJ did not provide any accommodation for his chronic daily headaches [17 at 6]. He also argues that the ALJ's RFC assessment must have incorporated all of plaintiff's "limitations supported by the medical record" and cites to 20 C.F.R. § 404.1545, that the ALJ ignored his headache symptoms, and the ALJ did no analysis of the headache symptoms [17 at 6-8]. The Commissioner argues that even though the ALJ found that plaintiff did not have any severe physical impairments, he included limitations in the RFC finding to accommodate plaintiff's headaches [24 at 3]. In doing so, the ALJ adopted state agency physician, Dr. Greco's, opinion that plaintiff was to avoid concentrated exposure to noise and pulmonary irritants (*Id.*).

Plaintiff relies on *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) in support of his subjective symptom of pain analysis. Unlike that case, the ALJ here did not fail to "recognize the years of records" of migraines noting that plaintiff "has a history of migraine headaches since childhood" (R. 17); 743 F.3d at 1123. But the

ALJ did cherry pick the evidence and failed to discuss or balance the reports of plaintiff's own doctors. The Commissioner is correct in his brief to point out that the ALJ recognized some of the medical evidence in the record concerning plaintiff's headaches. For example, the ALJ noted plaintiff's history of migraine headaches since childhood; his occasional emergency room visits to control his headache symptoms; the imaging studies that showed no evidence of tumor or demyelinating disease and a neurological exam that was normal, and an August 26, 2014 MRI of plaintiff's brain that demonstrated no intracranial lesion, prominent arachnoid space and no hydrocephalus; and plaintiff's appointment with an ophthalmologist thinking his headaches were associated with issues in his eyes and the ophthalmologist assuring plaintiff that nothing was wrong with his eyes (R. 17-18). The ALJ also recounted plaintiff's testimony regarding the frequency of his headaches at four days a week; the sharp pain on the right side of his head; staying in his room all day; and his stoppage of taking medication and only taking over the counter medication for his headaches (R. 18). Finally, the ALJ also discussed the findings of state agency medical consultants, Drs. Hinchen and Greco (*Id.*).

However, contrary to the Commissioner's brief that focuses only on the ALJ's recounting of the record's medical evidence of plaintiff's history of headaches, the ALJ failed to balance this evidence with the treatment records of plaintiff's own physicians, Drs. Lee, Hurley, McCahill, and Imlach (R. 17-18). While an ALJ's decision cannot be overturned because one may weigh the evidence differently, the ALJ must first actually weigh the conflicting evidence. *Shideler*, 688 F.3d at 310 ("We

do not reweigh the evidence or substitute our own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review"). Here, it is the absence of balancing of that conflicting evidence that supports remand.

An "ALJ must consider subjective complaints of pain if a claimant has established a medically determined impairment that could reasonably be expected to produce the pain." *Moore v. Colvin*, 743 F. 3d at 1125. Plaintiff established his history of headaches and testified as to his limitations. His treators discussed plaintiff's complaints of pain in his right temple, abnormal findings in his MRI, chronic headaches, medications, and the suggestion that plaintiff visit a headache clinic. Like in *Moore*, here the ALJ failed to address the evidence in a "balanced manner." The ALJ recognized plaintiff's pain but failed to balance plaintiff's subjective symptoms with the medical evidence of record, namely the treators' reports. *Id*. at 1125-26. This Court is not here to reweigh the evidence. And after remand, it may likely be that the outcome will not change. However, it is for the ALJ to address the evidence in a balanced manner first.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion for summary judgment [16] is granted, and the Commissioner's request for affirmation of the ALJ's decision [24] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded for further proceedings consistent with this opinion. The case is terminated.


**ENTER:**


**HEATHER K. McSHAIN**
**United States Magistrate Judge**


**DATED:  September 21, 2020**